WHITE *v.* STATE.

Opinion delivered March 18, 1905.

VERDICT—SUFFICIENCY OF EVIDENCE.—A verdict will not be disturbed if it is based on evidence legally sufficient to sustain it.

Appeal from Ashley Circuit Court.

ZACHARIAH T. WOOD, Judge.

Affirmed.

*George W. Norman* and *W. A. Roby,* for appellant.

Instruction No. 8, upon the question of drunkenness as an excuse for crime, was erroneous. 71 Ark. 459.

*Robert L. Rogers, Attorney General,* for appellee.

The verdict will not be set aside, because it was for a lower degree of homicide than the defendant was actually guilty of. 38 Ark. 403; 50 Ark. 506.

HILL, C. J. Joe White was a farmer living on Bayou Bartholomew, in Ashley County, and had as tenant Robert L. Adams, who lived near him. On the day in question White went to Wilmot, a town about three miles from his residence, and brought back with him a supply of whisky. On reaching the bayou he met Adams, and, owing to some threats prevalent in the neighborhood, which rendered Adams uneasy, invited him and his wife to spend the night at his (White's) home. They came shortly afterward, and they and Mr. White's sister, Tennie Turner, were in the house during the occurrences hereinafter related. White seemed to be drinking considerably, and his wife some, also. They were teasing Adams and wife about being frightened, and Mrs. White joined in the jokes being perpetrated on account of their fears. White and his wife were dancing together and singing when White said he was going to shoot into the top of the house, and suited the action to the word, and fired his pistol into the roof. Adams and his wife ran into an adjoining room, and Tennie Turner was looking at them when a second shot was fired. This shot struck Mrs. White about two inches to the left of the navel, and ranged downward, killing her. White seemed much distressed over the injury to his wife, sent for a doctor at once, and tried to alleviate her sufferings. White claimed he did not kill his wife, and that some one shot her through the door. He attempted to conceal her clothing, which was powder-burned.

He exhibited his pistol to a neighbor with only one chamber empty, and in other ways attempted to manufacture evidence in his own behalf. Tennie Turner testified that when White came home he quarreled with his wife and struck her, and seemed to be drinking considerably. After supper the quarrel was renewed, the wife threatening to send a note to the whisky seller at Wilmot to stop selling White liquor, and he threatened to kill her, and later struck her again. After this the playing began, and the wife invited him to the dance which ended so tragically.

There is other evidence of threats and bad feeling between husband and wife, and that he once before shot at her. All of this evidence is strongly contradicted by the defendant, and as to his relations with his wife being affectionate he is corroborated. The jury, however, credited Tennie Turner's and the other incriminatory evidence, and convicted him of murder in the second degree, and assessed his punishment at five years in the penitentiary. The only errors assigned by counsel for the appellant are that the verdict is not supported by the evidence, and that the court gave an instruction defining when and when not drunkenness excuses crime. The instruction is not objected to as abstractly incorrect, but because there was no such theory in the case, and it was inappropriate and misleading. There was evidence of White drinking heavily up to the time of the tragedy, and White claimed not to believe his own act caused his wife's death. This presented a feature of the case rendering the instruction appropriate; certainly it was not prejudicial to appellant, and no attack has been made on any other instruction or ruling of the court. The theory of accidental killing has been strongly pressed, but doubtless it was pressed with equal vigor before the jury and the trial judge. The evident desire of the appellant to manufacture evidence in his own behalf and deny the killing was doubtless a reason why the jury did not accept his after version of an accidental killing. The testimony of Tennie Turner alone, if believed, amply sustains the verdict. The jury and the trial judge were satisfied, and this court cannot invade the province of the jury, and say that the evidence does not satisfy when it has satisfied them, and is legally sufficient to sustain the verdict. The judgment is affirmed.

RIDDICK, J., (dissenting.)   I have carefully read the evidence in this case, but I am not able to concur in the judgment of the court affirming the conviction and judgment below for murder in the first degree.   The whole evidence introduced on the part of the State, as well as the defense, shows clearly to my mind that, though the defendant fired the shot that killed his wife, it was the result of an accident, and not intentional on his part. The defendant, Joe White, and his wife, Lou White, lived in a cabin in the bottoms of Bayou Bartholomew.   A man by the name of Adams and his wife lived near them.   Some persons living in that vicinity became, for reasons not shown in the record, unfriendly toward the defendant White, and he had received warnings to leave, with threats that if he did not leave he would be killed.   Some of his friends advised him to leave in order to avoid trouble with these parties.   As White had made preparations to plant his crop, he did not wish to be driven away from his home in that way, and he seems to have made ready to resist an attack.   But Adams, his neighbor, became alarmed by these threats, which, though not so stated in the record, seem to have been secretly made, and he contemplated leaving.   White heard of this, and went to see him to get him to change his mind, and invited Adams and his wife to come over and spend the night with him.   White had been to town on that day, and, probably in order to entertain Adams, or because he liked it himself, he brought a bottle of whisky home with him.   Besides Adams and wife, Tennie Turner, a sister of White's wife, spent the night with them.   After supper Adams and his wife, and probably some of the others, indulged to some extent in drink, and became rather lively, but were all in the best of humor.

It is true that the State undertakes to prove by Tennie Turner, a girl of fourteen, the sister of Mrs. White, that Joe White had made threats against his wife.   The witness shows some feeling against White, and it crops out in the evidence that, after the death of Mrs. White, her brothers and other members of her family were not friendly toward White, he having caused their sister's death.   But, notwithstanding Tennie Turner is not a very friendly witness, her evidence, as well as that of other witnesses, shows that these threats, if ever made, were only jokes.

Her statement is that, while White and Bob Adams were out in the front of the house, her sister went out there, and reprimanded her husband for drinking too much. That he got up, and started in the house, remarking as he did so, "I am going in there and kill that damn woman directly." That when he got in the house, he came up to where his wife was sitting with her baby in her arms, and struck her with a pistol which he held in his hand. Now, Adams testified that Mrs. White came out where he and her husband were on the gallery, and told them to come in the house, intimating that they were exposed to danger out there, and that White did say, "What is the matter with that damn woman? I'll go in there and kill her directly." But Adams and his wife, Ida Adams, both testified that this was said in fun, and both say that they not only did not see White strike his wife, but that they saw not the slightest indication of any quarrel or ill feeling between them. On the contrary, they say that they were both in the best of humor, and seemed to be constantly poking fun at Adams and his wife for being such cowards as to talk of leaving the place on account of the threats that had been made. Mrs. White was the leading spirit in these practical jokes and fun which they were having at the expense of Adams and his wife. The testimony of Tennie Turner shows this as plainly as that of the other witnesses, and, when taken all together, shows also that the threats of which she speaks were nothing but a part of this rather rude horse play; for, after having testified to the so-called threats, and that defendant then hit his wife with a pistol, an act which neither of the other witnesses saw, she says that Mrs. White invited her husband to dance with her, telling him she could beat him dancing. Does this look like the act of a wife whose husband had assaulted her with a pistol? According to the statement of this witness, immediately after these threats were made, White and his wife began dancing on the floor together, she holding a light single-barrel gun in one of her hands, while he held in his hand a forty-four self-cocking revolver. But let us quote the language of the witness, for, though she evidently tried to leave the impression that Joe and his wife were on bad terms, she shows conclusively that this was not so. These are her words descriptive of the accident: "Soon after this Joe and Lou began to play around

the house, dancing and singing. Lou took some whisky; she did not drink much; Joe drank a good deal. Lou was making fun of Bob for being such a coward. I heard her say that if Bob and Ida went into the shed room to go to bed she was going to shoot into the mattress. Lou told Joe she could beat him dancing; Joe said she could not; and they went to dancing. Joe had the pistol, and Lou had a gun at this time. Joe said he was going to shoot into the top of the house, and Lou said, "Shoot!" He pointed the pistol like he was going to shoot over my head, and I ran out in the middle of the floor. Then Joe pointed the pistol toward the top of the house, and fired. When the second shot was fired, I was looking at Bob and Ida, who were running into the shed room. When I looked back, Lou was lying on the floor, and Joe said to me, "Oh, Babe, have I shot my wife?"

Adams and his wife tell the story of the accident in almost the same words. They say that Mrs. White told her husband she could beat him dancing; that he said she couldn't; that they began to dance, she holding a small gun and he a pistol in his hand. They were still poking fun at Adams and his wife, and White, to add to the uproar, and to frighten Adams, told his wife that he was going to shoot through the top of the house. She told him to shoot, and immediately he shot upwards; then another shot fired. Adams testified that immediately after this last shot fired he heard White exclaim, "Lord have mercy! Have I shot my wife?" "When I looked," said Adams, "Joe was leaning over his wife, crying and trying to talk to her, but she never said anything that I heard. He and I took her up, and laid her on the bed." White then urged him to go for the doctor at once, and not to spare the horse; told him to get every doctor in town, and seemed greatly distressed at the accident.

Not only the testimony of the witnesses present at the time show that this was an accident, but this theory is confirmed by the fact that no motive is shown why White should wish to kill his wife, the mother of his infant child. Numbers of people who knew them testify to the pleasant relations between them, and show that they were warmly attached to each other. These witnesses say that they were exceptionally kind and affectionate toward each other, and that, though White was a very poor man, he often made sacrifices in order to gratify some wish of

his wife. In judging the acts of these people, we must remember that they were not members of "the Four Hundred." The evidence shows that White could not read the threatening letter which he received, and had to take it to town to get some one to read it to him. They were rude and uneducated. They indulged in noisy fun and rough jokes that would shock the tastes of refined people, but that does not prove that they were not attached to each other, or that their hearts were evil.

The theory of an accident is still further confirmed by the fact that the pistol which White held in his hand while dancing with his wife was self-cocking, and so easy on the trigger that the deputy sheriff who examined it testified that if the pistol had been fired in the top of the house and the finger left on the trigger and the weight of the pistol allowed to come down suddenly on the trigger, it would have fired itself without pressure from the finger. With such a pistol as that in the hands of White, and he more or less excited by drink and the dance and fun he was having, how easy it was for a slight unnoticed pressure of the finger to have launched on its fatal way the bullet that was to put an end to this gay frolic and lay dead at the feet of her husband this young wife whom the evidence shows he loved sincerely!

There is really nothing in the evidence to contradict this testimony of the three eyewitnesses of the tragedy. It was an act of carelessness, I admit, for which White should, under the law, be punished. He had no business to play with a loaded pistol in a house in that way where there were a number of people, even though it was done in fun. But there is a wide difference in law between the crimes of murder and involuntary manslaughter. The evidence shows that White was guilty of the lower crime, and with equal clearness it shows that he was not guilty of murder.

In a recent case the Court of Appeals of New York had before it a case where there was some evidence to sustain a verdict for murder, but the court held it not sufficient, and said: "A party cannot be convicted of murder, or any other grade of homicide, whenever there is merely some evidence or any evidence to sustain the charge; and the court, upon the trial of such cases,

may be called upon to decide, as a matter of law, whether the evidence is of such a character or quality as to warrant a conviction. If this were not the rule, the jury would in all cases be the sole judge of the question, and there would be no remedy in this court against convictions clearly based on insufficient evidence." The court further said that "so long as the burden is upon the People of not only removing the presumption of innocence, but of establishing the guilt of the accused beyond a reasonable doubt, a mere scintilla, or even some proof, is not sufficient to warrant the submission of the case to the jury." *People* v. *Ledwon*, 153 N. Y. 10.

It needs no argument to show that this must be the law, for otherwise courts would relinquish to the jury their high prerogative of protecting the innocent against unjust and unwarranted convictions. The facts of this case call for the exercise of that power by the court.

In my opinion, the evidence in this case is clearly not sufficient to sustain a conviction for murder, and I think that the judgment should be reversed, and the cause remanded, with an order to sentence the prisoner for involuntary manslaughter. I therefore dissent from the judgment of affirmance.

McCULLOCH, J., concurs in this opinion.